UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION
CASE NO. 1:11-CV-157

JOHN MADISON                                                                    PLAINTIFF

v.

NATIONWIDE MUTUAL
INSURANCE COMPANY                                                               DEFENDANT

**MEMORANDUM OPINION**

This matter comes before the Court on the Defendant's motion for summary judgment. (Def.'s Mot., Docket Number ("DN") 39.) The Plaintiff responded. (Pl.'s Resp., DN 43.) The Defendant replied. (Def.'s Reply, DN 44.) Fully briefed, the matter is ripe for adjudication. For the following reasons, the Defendant's motion is **GRANTED**.

**I.**

In this action, Plaintiff John Madison ("Madison") alleges that Defendant Nationwide Mutual Insurance Company ("Nationwide") acted in bad faith and violated Kentucky's Unfair Claim Settlement Practices Act ("UCSPA"), KRS § 304.12-230, when resolving an underlying claim for uninsured motorist ("UM") insurance benefits. Upon review of the record, the Court finds that Madison has not put forth evidence sufficient to warrant an award of punitive damages. Accordingly, his bad faith claim fails as a matter of law, and Nationwide is entitled to summary judgment.

**II.**

In 2009, Madison had the misfortune of being involved in two automobile accidents. In the first accident (the "March accident"), Madison suffered neck and back injuries and made claims against Cincinnati Insurance Company, the tortfeasor's insurer, for medical expenses, lost

1

wages, pain and suffering, and future medical expenses. Madison ultimately settled those claims without litigation for $50,000. In the second accident (the "August accident"), Madison suffered similar injuries and made similar claims. The tortfeasor responsible for the August accident, Berri Humphrey ("Humphrey"), was uninsured, and Madison sought to recover the benefits of the UM policy he purchased from Nationwide.

On December 17, 2009, Kurt Maier, the attorney representing Madison in both accidents, sent Nationwide a letter detailing Madison's claims arising from the August accident. This was not a demand letter but merely provided estimates of Madison's losses. Of particular note, Maier estimated that Madison, who is paid commissions from insurance policy sales, earned an income of $21,466.59 per month and lost two months of wages because of the August accident. This lost wage estimate contrasts with an earlier estimate Madison gave following the March accident. Four months prior, in an August 28, 2009 letter to Cincinnati Insurance Company, Madison estimated his income to be $6,000 per month, or approximately two and half times less than the estimate given to Nationwide.

Subsequent to receiving the December 2009 letter, Nationwide offered to settle Madison's claims for $2,000. Madison rejected that offer, and, instead of countering with his own, he filed a state court case against Humphrey and Nationwide on March 4, 2010. When the claim proceeded to litigation, it was assigned to Nationwide Litigation Specialist Daniel Todaro ("Todaro"), who initially estimated that the case had a settlement value between $10,309.45 and $14,309.45. He subsequently contacted attorney Maier to discuss settlement, but because of the large lost wage claim, no offer was made, and the parties agreed to conduct discovery and attempt to resolve the case once discovery was completed.

In course of discovery, Madison was examined by physicians for each side. Dr.

Christopher Taleghani, Madison's treating physician, acknowledged that it was difficult to differentiate between Madison's injuries caused by the March and August accidents but believed that 25 percent of his neck pain and 100 percent of his back pain were caused by the August accident. On the other hand, Dr. Dennis O'Keefe, who was retained by Nationwide to review Madison's medical records, concluded that Madison did not suffer any significant or permanent injuries as a result of the August accident.

On May 6, 2011, Madison supplemented his answers and responses to Nationwide's interrogatories. The supplemental answers clarified Madison's claims and revealed that he was seeking $16,960.86 for medical expenses, $90,000 for future medical expenses, $37,566.55 for lost wages, $100,000 for future impaired wages, and $250,000 for pain and suffering. Prior to the supplemental responses, but after discovery was completed, Nationwide made a settlement offer of $10,000 on April 27, 2011. On May 3, 2011, Madison rejected that offer and countered with his first demand of $95,000. On May 17, 2011, after Nationwide had received the supplemental disclosures, the company increased its settlement offer to $20,000. The next day, on May 18, 2011, Madison again rejected the offer but in the process reduced his counter to $80,000. On May 20, 2011, Nationwide raised its offer to $25,000. On May 24, 2011, several exchanges occurred. First, Madison rejected the outstanding offer and did not counter. Nationwide then increased to $35,000 but stated that this was its last best offer. Madison rejected and made a final demand for $75,000.

Madison's case against Humphrey and Nationwide proceeded to trial on May 26, 2011. In reviewing the case prior to trial, Todaro assessed Humphrey with 100 percent fault for the accident. Despite this, Nationwide asserted an affirmative defense of comparative fault and, in response to Madison's request for admissions, denied that Humphrey was solely responsible for

the accident. Therefore, liability was an issue at trial. After two days of proof, the case was given to the jury, which found Humphrey to be 100 percent at fault and awarded Madison $50,000. This was $15,000 more than Nationwide offered before trial and $25,000 less than Madison demanded. The award was apportioned as follows: $10,000 for pain and suffering, $25,000 for future medical expenses, $7,000 for lost wages, and $8,000 for permanent impairment of Madison's power to earn money in the future.[1] In addition to damages, the state court ordered Nationwide to pay Madison's costs and attorneys' fees for requiring him to prove liability.[2]

On June 1, 2011, the trial court entered judgment against Nationwide in accordance with the jury's verdict. Thereafter, a dispute arose between the parties concerning how the judgment would be paid. First, both parties agreed that $3,085 should be deducted from the $7,000 awarded for lost wages because Madison had already received that amount from his personal injury protection ("PIP") benefits. Second, the parties disagreed as to whether the remaining amount of the judgment should be paid solely from Madison's UM benefits or whether some portion could be satisfied from an additional personal injury protection ("APIP") policy he purchased from Nationwide. The parties never resolved this dispute.[3] Ultimately, on July 22, 2011, Nationwide issued two checks to Madison in satisfaction of the judgment. The first check was for $21,084.53, and was noted as having been paid from the APIP policy. The second check

---

[1] No award was made for Madison's past medical expenses because those were paid from Madison's personal injury protection ("PIP") coverage.
[2] Under Kentucky's Rules of Civil Procedure, "[i]f a party fails to admit . . . the truth of any matter as requested . . . and if the party requesting the admissions thereafter proves . . . the truth of the matter, he may apply to the court for an order requiring the other party to pay him the reasonable expenses incurred in making that proof, including reasonable attorney's fees." Ky. R. Civ. P. 37.03. Therefore, when Nationwide denied that Humphrey was solely responsible for the accident, and Madison proved thereafter that she was, Madison applied for and received attorneys' fees and expenses under Rule 37.03.
[3] Both parties cited to *State Farm Mut. Auto. Ins. v. Fletcher*, 758 S.W.2d 41 (1979), in support of their argument concerning payment of the judgment. In the present case, they maintain that their individual positions are correct but admit that whether a judgment can be apportioned between UM coverage and remaining PIP coverage is an unresolved issued in Kentucky law.

was for the remaining $25,080.19, and was paid from Madison's UM coverage.

Based on the foregoing facts and those further detailed below, Madison filed this second action against Nationwide. He alleges that the company violated Kentucky's UCSPA and acted in bad faith when attempting to reach a settlement of Madison's UM claim. Nationwide argues that summary judgment is appropriate because Madison has not supported his claim with evidence sufficient to support an award of punitive damages.

## III.

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact." *Street v. J. C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996). The plaintiff must present more than a mere scintilla of evidence in support of his position; the plaintiff must present evidence on which the trier of fact could reasonably find for the plaintiff. *See id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). The plaintiff may accomplish this by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute . . . ." Fed. R. Civ. P. 56(c)(1). Mere speculation will not suffice to defeat a motion for summary judgment; "the mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment. A genuine dispute between the

parties on an issue of material fact must exist to render summary judgment inappropriate." *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996), *abrogated on other grounds by Lewis v. Humbolt Acquisition Corp., Inc.*, 681 F.3d 312 (6th Cir. 2012).

Finally, while the substantive law of Kentucky is applicable to this case pursuant to *Erie Railroad v. Tompkins*, 304 U.S. 64 (1938), a federal court sitting in diversity applies the standards of Federal Rule of Civil Procedure 56, not "Kentucky's summary judgment standard as expressed in *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476 (Ky. 1991)." *Gafford v. Gen. Elec. Co.*, 997 F.2d 150, 165 (6th Cir. 1993) (abrogated on other grounds in *Hertz Corp. v. Friend*, 130 S. Ct. 1181 (2010)).

**IV.**

Generally, Kentucky's UCSPA, KRS § 304.12-230, "is intended 'to protect the public from unfair trade practices and fraud' and 'imposes what is generally known as the duty of good faith and fair dealing owed by an insurer to an insured.'" *Phelps v. State Farm Mut. Auto. Ins. Co.*, 680 F.3d 725, 731 (6th Cir. 2012) (internal citations omitted) (quoting *State Farm Mut. Auto. Ins. Co. v. Reeder*, 763 S.W.2d 116, 118 (Ky. 1988); *Knotts v. Zurich Ins. Co.*, 197 S.W.3d 512, 515 (Ky. 2006)). An insurer's violation of the UCSPA creates a cause of action both for the insured as well as for those who have claims against the insureds, and the same standard applies in both types of cases. *Id.* (citing *Motorists Mut. Ins. Co. v. Glass*, 996 S.W.2d 437, 454 (Ky. 1999)); *see also Davidson v. Am. Freightways, Inc.*, 25 S.W.3d 94, 100 (Ky. 2000) (stating that there is one test for bad faith in Kentucky, which applies equally to bad faith claims brought by first- or third-parties).

In order to state a claim under the UCSPA, a plaintiff "must meet a high threshold standard that requires evidence of 'intentional misconduct or reckless disregard of the rights of

an insured or a claimant' by the insurance company that would support an award of punitive damages." *Phelps*, 680 F.3d at 731 (quoting *Wittmer v. Jones*, 864 S.W. 2d 864, 890 (Ky. 1993)); *see also United Servs. Auto. Ass'n v. Bult*, 183 S.W.3d 181, 186 (Ky. Ct. App. 2003) (describing the requisite threshold as "high indeed"). The Kentucky Supreme Court specifically describes the standard as that of "outrageous" conduct by the insurer. *Wittmer*, 864 S.W.2d at 890. Stated differently, a plaintiff must show "proof of bad faith . . . sufficient for the jury to conclude that there was 'conduct that is *outrageous*, because of the *defendant's evil motive* or his *reckless indifference* to [her] rights . . . . This means there must be sufficient evidence of *intentional misconduct or reckless disregard of the rights of an insured or a claimant to warrant submitting the right to award punitive damages to the jury*." *Bult*, 183 S.W.3d at 186 (emphasis in original) (quoting *Wittmer*, 864 S.W.2d at 890). As the Kentucky Court of Appeals stated in *Bult*:

> Evidence must demonstrate that an insurer has engaged in outrageous conduct toward its insured. Furthermore, the conduct must be driven by evil motives or by an indifference to its insureds' rights. Absent such evidence of egregious behavior, the tort claim predicated on bad faith may not proceed to a jury. Evidence of mere negligence or failure to pay a claim in timely fashion will not suffice to support a claim for bad faith. Inadvertence, sloppiness, or tardiness will not suffice; instead, the element of malice or flagrant malfeasance must be shown.

*Id.* Once a plaintiff has met this initial showing, she must establish three elements to maintain a claim of bad faith:

> (1) the insurer must be obligated to pay the claim under the terms of the policy; (2) the insurer must lack a reasonable basis in law or fact for denying the claim; and (3) it must be shown that the insurer either knew there was no reasonable basis for denying the claim or acted with reckless disregard for whether such a basis existed.

*Wittmer*, 864 S.W.2d at 890; *accord Phelps*, 680 F.3d at 731; *Glass*, 996 S.W.2d at 452.

## V.

Madison alleges that Nationwide's bad faith is evidenced by two broad categories of

7

conduct. First, relying on the Sixth Circuit's decision in *Phelps*, Madison identifies several instances of "settlement conduct" that were supposedly undertaken in bad faith. Second, Madison points to Nationwide's "post-judgment conduct" related to the payment of the judgment as evidence of bad faith. The Court considers both categories.

a.

In *Phelps*, the Sixth Circuit highlighted five categories of settlement conduct sufficient to raise a genuine factual dispute and thus, presumably, to satisfy the high Kentucky threshold standard. First, the insurer in that case made a "lowball" offer at the low end of both its own evaluation of the claim and the claimant's documented costs, which failed to reasonably account for either the claimant's pain and suffering or future wage loss. *Phelps*, 680 F.3d at 733. Second, the court found "general evidence of delay tactics" and "questionable delays" in processing the claim, which raised triable issues of whether the insurer "exhibited bad faith i[n] the extensive delay of nearly three years." *Id.* at 733-34. Third, the insurer refused to disclose its policy limits. *Id.* at 734. Fourth, the court found "some evidence of troubling claims-handling practices by [the insurer] both in this case and in general," which included switching adjusters without explanation, habitually making lowball offers, refusing to increase offers without additional documentation, and failing to include facts in its claims file that would support a jury verdict in the claimant's favor. *Id.* at 735. And fifth, the court took issue with the district court's failure to consider the claimant's two expert witnesses, whose opinions "raise[d] a genuine dispute as to [the insurer's] compliance with the UCSPA." *Id.* In this action, Madison claims that evidence of bad faith exists under the first, second, fourth, and fifth categories identified in *Phelps*. The Court disagrees.

**1.**

First, Madison asserts that several claims-handling practices by Nationwide raise the specter of bad faith. In particular, Madison alleges that Todaro ignored the lost wage calculations conducted by Nationwide's PIP investigator, had a fixed settlement authority that was unrelated to the value of the case, and disregarded the valuation placed on the case by the attorney retained to represented Nationwide.

**i.**

Shortly after the August accident Madison made a claim for lost wages under the APIP policy he purchased from Nationwide. Becky Clack was assigned by Nationwide to handle that claim. Based on her investigation, she calculated Madison's monthly income to be $3,947.13. During her deposition, she discovered that her calculations contained an error, which, if corrected, would have increased Madison's monthly income to the weekly limits of the APIP policy. Her lost wage calculations were sent to the pre-litigation UM adjuster, Charlie Stevens, once Nationwide was notified that Madison intended to pursue a UM claim. Stevens' UM file was transferred Daniel Todaro when the claim proceeded to litigation. Therefore, it is undisputed that Todaro possessed Clack's APIP lost-wage calculation when evaluating Madison's UM claim. Todaro admitted in his deposition that he did not review or consider Clack's calculations when evaluating Madison's lost wage claim for the purposes of UM coverage. According to Todaro, he did not do so because PIP and UM lost wage calculations are evaluated differently. Todaro used Madison's income tax returns to value the wage loss at $1,732 per month. Madison claims that Nationwide acted in bad faith when Todaro did not consider the lost wage claim calculated by Clack.

Madison's argument misses the mark because it ignores the complicated nature of his lost

wage claim. At least five different wage calculations appear in the record. After the March accident, Madison estimated his income to be $6,000 a month. After the August accident he claimed it was $21,466.59 per month. In another document submitted to Nationwide, he listed his monthly income at $7,500. When calculating his lost wages for PIP purposes, Clack estimated his income to be around $4,000 a month. Todaro used Madison's tax returns to estimate his income to be approximately $1,700 per month. Finally, Madison conceded in his response brief that "his income varies and can be more difficult to determine than the typical hourly or salaried employee." (Pl.'s Resp., DN 43, p. 8.) Under Kentucky law, "a tort claim for bad faith refusal to pay must first be tested to determine whether the insurer's refusal to pay involved a claim which was fairly debatable as to either the law or the facts." *Empire Fire & Marine Ins. Co. v. Simpsonville Wrecker Service, Inc.*, 800 S.W.2d 886, 890 (Ky. Ct. App. 1994). Where the claim is fairly debatable, and the insurer fairly debates it, the insured cannot maintain a bad faith claim. *Id.*; *Farmland Mut. Ins. Co. v. Johnson*, 36 S.W.3d 368, 375-76 (Ky. 2000). It is clear that Madison's lost wage claim was "fairly datable" given the numerous factual disputes surrounding it. Furthermore, the Court finds that Nationwide debated the claim fairly during the discovery and settlement process. Although Todaro did not consider Clack's evaluation, the Court simply cannot find that his action were in bad faith or were outrageous when he conducted his own evaluation in light of the various income levels either discovered by Nationwide or asserted by Madison during the course of the UM action.

**ii.**

Next, Madison argues that Nationwide acted in bad faith by limiting Todaro's settlement authority. In his deposition, Todaro testified that the maximum amount he was authorized to offer in settlement of any case, not just Madison's, was $35,000. This authority was fixed and

had not increased in the seven years that he handled litigation claims for Nationwide. Madison argues that a predetermined settlement authority evidences bad faith because it shows that Nationwide's settlement offers were unrelated to the facts of the underlying case. Madison's argument is unconvincing for at least two reasons.

First, it suffers from an evidentiary deficiency. Todaro's deposition testimony is that the $35,000 settlement offer made by Nationwide resulted from a conference between Todaro, his managers, and a Nationwide staff attorney, and not an arbitrary reliance on an established settlement authority. In the conference, they evaluated Madison's case and decided to try and resolve it for $35,000 even though their actual valuation of Madison's claims was less than that amount. Accordingly, Madison fails to present any evidence that the fixed settlement authority limited or otherwise influenced Nationwide's attempts to settle the case. Their offer was based on an evaluation of the case, not an arbitrary cap on claims. The Court perceives no bad faith or outrageous conduct by Nationwide in offering $35,000 to settle the UM claims even though that amount corresponded to Todaro's fixed settlement amount.

Second, Madison's argument suffers from a legal deficiency. Madison broadly asserts that a jury could infer Nationwide's bad faith based on the fixed settlement authority. Despite this broad assertion, Madison has not supported his argument with citations to cases or other authority that stands for that proposition. Absent supporting authority, the Court finds no bad faith in Nationwide's actions.

### iii.

Madison also alleges that Nationwide acted in bad faith because Todaro disregarded the case valuation performed by Brent Brennenstuhl, the attorney representing Nationwide in the UM case. In a pretrial report sent to Nationwide, Brennenstuhl estimated that Madison's pain

and suffering alone was valued at $50,000. Madison claims that Todaro did not consider Brennenstuhl's evaluation when preparing settlement offers in the case. This is not borne out by the record, and the ultimate of jury award of award of $50,000, of which only $10,000 was for pain and suffering, evidences that Nationwide did not act in bad faith.

In his deposition, Todaro acknowledged receiving Brennenstuhl's pain and suffering estimate. Contrary to Madison's assertions, however, Todaro did not disregard the evaluation. Rather, he testified that he may have considered it, but did not take it whole-cloth, because he conducts his own valuation of cases based on all information in the claim file. Furthermore, Brennenstuhl commented in his deposition that the pain and suffering estimate was his "best guesstimate" based on the information Nationwide had at the time of the report. In the same report it was noted that Dr. O'Keefe was reviewing Madison's medical records but had not given his ultimate opinion that Madison suffered no injuries in the August accident. Accordingly, it was far less than outrageous for Todaro to discount Brennenstuhl's pain and suffering valuation later in the litigation process when discovery was completed and Dr. O'Keefe's opinion had been received. No indicia of bad faith arise from Todaro's conduct in this regard.

**2.**

Second, Madison argues that bad faith is apparent because Nationwide's initial settlement offer was a "lowball" amount and because the final settlement offer was substantially less than that ultimately recovered. Madison's positions are unsubstantiated on both points.

As detailed above, when Todaro was assigned to the case, he placed an initial settlement value of between $10,309.45 and $14,309.45 on the claim. More than a year later, and shortly before discovery was completed, Nationwide offered to settle the case for $10,000. Madison claims that this represented a "lowball" offer undertaken in bad faith. Madison's argument

12

ignores two key matters, however. First, Todaro testified that his settlement valuation ($10,309.45-$14,309.45) was not the same as his evaluation of Madison's actual damages. In fact, he concluded that Madison suffered $8,000 in actual damages, but that it would take an amount near his estimated settlement value to resolve the case. Accordingly, the initial offer of $10,000 was 25 percent higher than actual value Todaro placed on Madison's damages and was not a "lowball" offer.[4] Second, Madison supports his lowball-offer argument with reference to the $8,500 in past medical expenses and $3,800 in lost wages he incurred during the year prior to the initial settlement offer. The past medical expenses were paid out of Madison's PIP coverage prior to Nationwide's offer to settle the UM and are therefore irrelevant to settlement of the UM claim. Madison's reliance on damages paid out of the separate PIP policy is unavailing to prove a lowball offer on the UM claim.

Madison also claims that Nationwide's bad faith is evidenced by the fact that he was compelled to institute litigation to recover an amount that was "substantially less" than the judgment he received. Madison bases his argument KRS § 304.12-230(7), which states that it is bad faith to compel "insureds to institute litigation to recover amount due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds." Nationwide made a final settlement offer of $35,000, and the jury returned a verdict for $50,000. Madison argues that a jury in this bad faith action could determine that the $15,000 difference between the final offer and ultimate judgment was "substantially less" for the

---

[4] Madison's reliance on *Phelps* on this point is misplaced. In *Phelps*, the Sixth Circuit found an indicia of bad faith because State Farm's "initial offer of $25,000 was just barely above the low end of both its own evaluation of the claim ($24,620 to $49,620) and Phelps's documentation of medical and wage-lost costs ($22,620.22)." *Phelps*, 680 F.3d at 733. A distinction exists between the "evaluation of a claim" and the "settlement value of a claim." The settlement value will often be higher than the actual damage valuation because the settlement value considers litigation costs savings to the insurer in addition to the insured's actual damages. As this Court reads *Phelps*, State Farm evaluated Phelps's actual damages in the range of $24,620 to $49,620. This range did not represent State Farm's perceived "settlement value" of the case, and State Farm made a "lowball" offer when it offered to settle the case slightly above the actual, rather than settlement, value of Phelps's damages. In the present case, Nationwide made an initial offer very near its estimated settlement value and above the actual damage estimate.

13

purposes of KRS § 304.12-230(7).  The Court disagrees.  Disparity between a jury's award and an insurer's offers "alone is insufficient to establish bad faith."  *Martindale v. First Nat'l Ins. Co. of Am.*, No. 2011-CA-001747-MR, 2012 WL 6632774, at *5 (Ky. Ct. App. Dec. 21, 2012).  In *Martindale*, the insurer offered the plaintiffs $25,000 before trial.  *Id.* at *4.  The jury returned a verdict against the insurer, which eventually paid the plaintiffs $185,804.97.  *Id.* at *1.  The court of appeals concluded that the $160,000 disparity between the offer and the judgment alone was insufficient to establish bad faith.  Because such a large disparity was insufficient to establish bad faith in that case, the Court will not find that the minimal disparity of $15,000 in this action is evidence of bad faith.

**3.**

Third, Madison alleges that the 23 month delay between the August 2009 accident and payment of the judgment in July of 2011 is further evidence of bad faith.  In support, Madison relies on *Phelps*, where the court found that a three-year delay could serve as evidence of bad faith.  *Phelps*, 680 F.3d at 733.  Additionally, the court cited to other cases in which delays of 18 and 27 months also demonstrated bad faith.  *Id.*  In *Phelps*, the court took particular issue with a six-and-half month delay that arose out of the request for certain medical records.  *Id.*  The insurer provided no explanation for the delay aside from the fact that the claims adjuster was replaced for a second time during the period.  *Id.*

The concerns addressed by the court in *Phelps* are not present in this case.  While it is true that a 23 month period existed between the accident and payment of the judgment, the Court does not consider any of this period to fall into the category of "delay."  Rather, this period merely represents the time in which the parties appropriately processed the case.  A review of the timeline of this case confirms that any delay was not of the type that indicates bad faith.

14

The August accident occurred on August 25, 2009. On August 27, 2009, attorney Maier sent Nationwide a letter of representation relating to the accident. Three-and-half months later, on December 17, 2009, Maier sent Nationwide a letter containing the first itemization of Madison's claims. Shortly thereafter, but before March 4, 2010, Nationwide offered Madison $2,000. Madison rejected that offer, and rather than countering with his own, he filed suit for UM benefits on March 4, 2010. Thereafter the case proceeded to discovery, during which written discovery was exchanged and at least four depositions were taken. Of particular importance, the report of Nationwide's medical expert, Dr. O'Keefe, was not completed until April 19, 2011. Eight days later, on April 27, 2011, Nationwide offered to settle the case for $10,000. Nationwide made this offer prior to Madison's May 6, 2011 supplement responses that listed, for the first time, the exact damages he was seeking in the case. Madison rejected the April 27 offer on May 3, 2011, and, for the first time, made a demand on Nationwide for $95,000. Between May 17 and May 24, 2011, the parties participated in a number of settlement discussion but could not reach a resolution. Therefore, the case proceeded to trial on May 26, 2011, with the judgment being entered by the court on June 1. Post-judgment, a dispute arose between the parties regarding how the judgment should be paid. On June 9, 2011, Nationwide's attorney notified Madison's counsel that the insurer planned to pay the judgment out of Madison's APIP and UM policies. Over the next few days, the attorneys exchanged correspondence, and Nationwide ultimately paid the amount of the judgment to Madison on July 22, 2011.

A number of observations can be made from the timeline of the underlying UM case. First, Nationwide made a pre-litigation offer to settle the claim less than five months after the accident. Second, discovery in the case took approximately one year, and Madison has not

15

presented evidence that there were delays or periods of inactivity during discovery similar to those in *Phelps*. In fact, the parties appear to have diligently managed the case by exchanging written discovery and conducting a number of depositions during this period. Third, Madison did not make a definite, numerical demand until May 3, 2011, less than a month before trial. And that demand only came in response to Nationwide's April 27 settlement offer. Fourth, despite their disagreement as to how the judgment should be paid, Madison received full payment of the amount he was determined to be legally entitled to within a month-and-half of the judgment being finalized. In all, there are simply no apparent or unexplained delays in the UM case, and therefore, the Court finds no indicia of bad faith from the fact that it took 23 months from the date of the accident to the payment of the judgment to resolve the underlying action.

**4.**

Finally, Madison claims that summary judgment is inappropriate and that bad faith is evidenced in this case by the opinions of his expert, Gary Fye ("Fye"). Interestingly, Fye appears to have been an expert in the *Phelps* case, and the Sixth Circuit found that summary judgment on the bad faith claim was inappropriate because the district court failed to give any consideration to Fye's opinion. *Phelps*, 680 F.3d at 735. Currently pending before the Court is Nationwide's *Daubert* motion to exclude Fye. (Def.'s Mot., DN 38.) The Court need not consider that motion, however. Assuming that Fye's opinion is admissible, the Court finds that his conclusions are not supported by the evidence and have little probative value. Accordingly, his opinions are insufficient to establish evidence that would warrant an award of punitive damages.

Fye concludes that Nationwide offered a lowball settlement, froze its assessment of damages, and forced Madison to file suit in order to recover UM benefits. None of these

conclusions are supported by the record. First, as shown above, the initial offer Nationwide made was greater than the value it assigned to Madison's estimated actual damages. Furthermore, Nationwide increased that offer on multiple occasions, ultimately offering more than three times its initial offer. Second, there is no evidence to support Fye's opinion that Nationwide froze its assessment of Madison's damages. Third, Nationwide did not "force" Madison to file the underlying UM claim. On December 17, 2009, Madison sent Nationwide a letter outlining his potential claims. Shortly thereafter, Nationwide offered him $2,000 to settle the claims. Madison rejected this offer and filed suit on March 4, 2010. Nationwide never denied Madison's claims, and he did not made a counter offer prior to filing suit. Under such circumstances, Fye's conclusion that Madison was forced into litigation is wholly unconnected to the actual evidence in this case.

Fye's opinions also have little probative value. He broadly concludes that "Nationwide abused Kentucky's bodily injury reparations process by lowballing and stonewalling to seek monetary gain, which is an example of reprehensible claim handling with egregious indifference to the rights of the policyholder." Despite this conclusion, he fails to discuss what "Kentucky's bodily injury reparations process" is and what specific facts demonstrate lowballing or stonewalling. Above, the Court discussed the specific timeline of the UM action and how there was no indicia of bad faith based on delays. The Court's previous discussion demonstrates that Fye's conclusion that Nationwide "stonewalled" in the UM action is without merit and unsupported.

In total, the Court finds that the admissibility of Fye's opinion is suspect. But even if those opinions are admissible, they are disconnected from and unsupported by the record and have little probative value. Therefore, Fye's opinions do not establish evidence sufficient to

warrant an award of punitive damages and do not raise a genuine dispute of material fact.

b.

In addition to the discussed settlement conduct, Madison alleges that Nationwide's post-judgment conduct evidences the insurer's bad faith. In particular, Madison claims that the judgment rendered at trial should have been paid entirely from Madison's UM policy and should not have been divided between that policy and his remaining APIP benefits. The Court finds that Nationwide's post-judgment conduct is not evidence of bad faith for two reasons.

First, it is unclear whether post-judgment conduct falls within the scope of a bad faith action. Kentucky's UCSPA delineates unfair claims *settlement* practices. As stated in *Phelps*, "[t]he UCSPA fundamentally requires that 'a good faith attempt be made to effectuate a prompt, fair and equitable *settlement*.'" *Phelps*, 680 F.3d at 731 (emphasis added) (quoting *Motorist Mut. Ins. Co. v. Glass*, 996 S.W.2d 437, 454 (Ky. 1999)). Where a UM claims proceeds to judgment and a dispute arises as to how that judgment should be paid, that dispute no longer involves settlement conduct. Although Kentucky courts hold that UCSPA applies "both before and during litigation," *Knotts v. Zurich Ins. Co.*, 197 S.W.3d 512, 517 (Ky. 2006), Madison has not pointed the Court to any authority showing that UCSPA is applicable to post-litigation or post-judgment conduct. Absent citation to such authority by the state courts, the Court hesitates to extend UCSPA's coverage to post-judgment conduct.

Second, even if UCSPA was applicable to post-judgment conduct (which the Court doubts), the "fairly debatable" standard would still apply. After the judgment was entered, the parties discussed among themselves how the jury award should be paid. Both parties relied on *State Farm Mut. Auto. Ins. v. Fletcher*, 758 S.W.2d 41 (1979), in support of their position, and both admit that the issue remained unresolved when Madison filed this bad faith action. The

18

parties have not asked the Court to consider the issue of division of payment in this action. It was clearly a matter that could have been addressed by the state court with authority over the judgment. Based on these facts, it appears to the Court that the issue of payment was "fairly debatable" and was fairly debated by the parties after the judgment. Therefore, even if UCSPA applies to Nationwide's post-judgment conduct, the Court would not find evidence sufficient to warrant an award of punitive damages because the issue of payment was fairly debatable and was fairly debated. Furthermore, it appears the parties reached an accord on the issue.

In all, whether Nationwide properly paid the judgment out of the appropriate policies appears to the Court to an issue sounding in contract and not bad faith. Accordingly, the Court will not consider Nationwide's post-judgment conduct as indicia of bad faith.

## VI.

Many aspects of bad faith claims have been addressed in the proceeding discussion, and none have raised evidence sufficient to warrant an award of punitive damages. To complete the analysis, the Court pauses to discuss the general tenor of the underlying UM action. In his supplemental responses to interrogatories made on May 6, 2011, Madison's damage claims totaled just shy of $500,000. Shortly thereafter and just before trial, Nationwide made a final offer of $35,000. Madison rejected that offer but reduced his own demand to $75,000. At trial, the jury returned a verdict in Madison's favor of $50,000. The actual verdict, which the Court takes to be the best evidence of the value Madison's UM claim, was closer to Nationwide's offer than Madison's final demand. Both parties placed a wrong valuation on the case and the jury nearly split the difference between their positions. Under those facts, the Court is hard-pressed to find any indicia of bad faith by Nationwide. The jury's verdict, while not dispositive, provides some concrete guidance into the value of Madison's UM claim. The Court does not find that

Nationwide operated in bad faith by undervaluing the UM claim by only $15,000. Stated simply, the Court finds no evidence of intentional misconduct by Nationwide or reckless disregard of Madison's rights that would support and award of punitive damages.

Frequently parties legitimately disagree on the value of a case. This is particularly true in cases where a plaintiff has a pre-existing medical condition and even truer where the injuries occur to soft tissues. It is clear that both side had different evaluations of the case as shown by the different offers they made while attempting to settle the action. Each party moved significantly in its offer and came close to settling. In the end, however, they drew the line and elected to proceed to trial. This is why we have jury trials. This is not a bad faith case. It is more like the typical soft tissue injury case often seen by the Court.

## CONCLUSION

Defendant Nationwide Mutual Insurance Company moved the Court for entry of summary judgment. For all of the foregoing reasons, that motion is **GRANTED**. A separate order and judgment shall issue.